JUDGE RAKOFF



09 CIV 8849

Joel M. Miller
Charles R. Jacob III
MILLER & WRUBEL P.C.
570 Lexington Avenue
New York, New York 10022
(212) 336-3500

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROLAND KISER,

                              Plaintiff,

        -against-

HSH NORDBANK AG,

                              Defendant.

09 Civ. _____  (        )

**ECF Case**

**COMPLAINT**

**JURY TRIAL DEMANDED**

        Plaintiff Roland Kiser ("Kiser"), by his attorneys Miller & Wrubel P.C., as

and for his Complaint against defendant HSH Nordbank AG ("Nordbank"), alleges as

follows:

### ALLEGATIONS COMMON TO
### ALL CAUSES OF ACTION

#### Preliminary Statement

        1.      For over seven years – from June 2002 until September 17, 2009,

when his employment was wrongfully terminated as set forth below – Kiser was the co-

founder, General Manager ("GM") and Chief Operating Officer ("COO") of Nordbank's

New York Branch, a New York State licensed branch of a German "Landesbank."  Kiser

reported directly to Nordbank's board of managing directors (the "Board") in Germany.

2.      Landesbanks are state-majority-owned banks, whose boards of managing directors are controlled by a Supervisory Board.  The members of the Supervisory Board are, in Nordbank's case, political appointees.

3.      Kiser co-led the growth of the New York Branch from start-up to a highly successful banking operation.  He was instrumental in Nordbank achieving and maintaining Financial Holding Company status with the Federal Reserve Board in January 2009, an objective indication that the New York Branch was well-managed. From 2002 through 2008, the New York Branch generated a total of $1.13 billion in revenue, and a net operating result, after costs and before taxes, of $548 million – making it the best performing branch of Nordbank.  Kiser's performance as GM and COO was nothing short of exemplary at all times, and his yearly performance reviews reflected that.  As recently as the summer of 2009 – when the matters referred to below were fully known to Nordbank – Kiser was proposed by members of the Board to be the Group COO and a Board member of Nordbank.

4.      Kiser was employed by Nordbank pursuant to an Employment Agreement dated June 1, 2007 (the "Employment Agreement") that guaranteed Kiser, except in the event of his resignation or termination for "cause," (a) annual salary of $300,000 through June 30, 2013, (b) annual incentive bonuses of at least $100,000 per year, (c) participation in Nordbank's Long Term Incentive Plan ("LTIP") "in accordance with [Nordbank's] policies and practices applicable to its executives."  Under the Employment Agreement, termination of Kiser for purported "cause," rather than without "cause," would deprive Kiser of this agreed compensation.

5.    Despite Kiser's outstanding performance, political pressure affecting Nordbank in Germany, rather than Kiser's performance as a banker, were to lead to his wrongful termination based on a false and defamatory claim of "cause" by Nordbank where no "cause" existed. The central player in this sequence of events was Nordbank's current Chief Executive Officer ("CEO"), Prof. Dr. Dirk Jens Nonnenmacher ("Nonnenmacher"), whose Machiavellian ascent to and consolidation of power – based more on internal and external politics rather than sound banking practices – were to lead to Kiser's wrongful termination.

6.    To draw attention from his own and Nordbank's problems which were under examination in the German media, Nonnenmacher caused Nordbank to terminate Kiser for "cause," invoking Section 6(iii) of the Employment Agreement, which required a good faith finding by the Board that Kiser "intentionally engage[ed] in conduct which is injurious to the Company [Nordbank] or its subsidiaries or affiliates including, but not limited to, theft, violent work-related behavior, sexual or other unlawful harassment, repeated acts of insubordination, willful dishonesty or fraud in connection with the Executive's [Kiser's] employment."

7.    In fact, Nonnenmacher was well aware that no such "cause" existed with respect to Kiser. Rather, Nonnenmacher caused Kiser's termination on September 17, 2009, ten days before the German elections held September 27, 2009, as a political publicity stunt aimed at the getting the political parties in power re-elected (which they were, narrowly). On information and belief, Nonnenmacher would not even put the vote on whether to terminate Kiser before the full Board of Nordbank, because Nonnenmacher knew he could not get a majority of the Board to vote to terminate Kiser.

Accordingly, Nonnemacher forced two Board members who, on information and belief, would have voted *not* to terminate Kiser, to "recuse" themselves, resulting in a 2-0 Board "vote" to terminate Kiser for "cause."

8.    Despite formal request from Kiser, Nordbank and Nonnenmacher to date have refused to disclose the purported "cause." On information and belief, however, the purported "cause" concerns alleged events from 2007 *as to which Kiser was previously exonerated by Nordbank*.

9.    Some two years before Kiser's termination, allegations were made against him by two disgruntled employees of the New York Branch – and even those allegations did not constitute "cause" – but Nordbank exonerated Kiser as to those allegations. Nordbank first hired its outside counsel, the recognized New York law firm Moses & Singer ("M&S"), to investigate these allegations. M&S was instructed to conduct an independent investigation without limitation as to time, cost or scope. After investigation, *M&S exonerated Kiser.*

10.    Months later, the disgruntled ex-employees filed grievances with the Equal Employment Opportunity Commission ("EEOC"). Nordbank then hired Proskauer Rose LLP ("Proskauer"), a leading employment law firm in New York, with which Nordbank had had no previous contact and which was wholly independent, to investigate again the allegations of the two ex-employees. After investigation, *Proskauer independently exonerated Kiser*.

11.    Nordbank, including its Chief Legal & Compliance Officer Wolfgang Goessmann ("Goessmann"), was kept fully informed about these matters at all

times.  Nonnenmacher was personally briefed on the facts of these matters and their status by Kiser on February 28, 2008.

12.    The ex-employees eventually received "right to sue" letters from the EEOC indicating that the EEOC was not going to take up their cases.  They did sue, making salacious allegations about Nordbank and Kiser.  These allegations are false and, as set forth below, remain completely unproven.

13.    Nordbank moved to dismiss both the ex-employees' lawsuits as failing to state any legally cognizable claim, even on paper.  The second such motion was filed October 9, 2009, *after* Kiser was terminated for alleged "cause."  In its motion, Nordbank states that the ex-employee was fired for legitimate business reasons (which is true, as set forth below) and was not the victim of any unlawful conduct, and that the claims against Kiser are "specious."  Thus, not only is Kiser innocent of these ex-employees' claims until proven otherwise; ***Nordbank itself asserts Kiser's innocence in court papers even after terminating him.***

14.    Proskauer's exoneration of Kiser in 2008 seemed to have brought this matter to a close for internal Nordbank purposes.  By the Spring of 2009, however, the political landscape at Nordbank and in Germany generally had changed, for the worse from Nonnenmacher's viewpoint.

15.    Significant losses in 2008 and early 2009 at Nordbank's group level (notably, not at the New York Branch) had created a liquidity crisis and other serious risk management and operating problems at Nordbank.  During this time, the New York Branch was the principal source of Nordbank's United States Dollar liquidity, providing the Head Office with funding at times up to $8 billion per day.

16.    In addition, the salacious nature of the allegations made against Kiser by the former Nordbank employees, set forth in court papers publicly available in New York, were the subject of media attention in Germany.

17.    Nonnenmacher faced bad publicity over his mismanagement of Nordbank – and his excessive special payment of 2.9 million Euros in mid-2009, achieved by Nonnenmacher getting himself appointed as not just CEO, but as COO, CFO and CRO, of Nordbank – in a year when no bonuses were paid to the staff of Nordbank. On information and belief, Nonnenmacher was fully aware by May and June of 2009 that Nordbank would be issuing press releases in the coming months addressing (a) Nonnenmacher's controversial decision to "give money away" to the investment bank Goldman Sachs, in the amount of $45 million, when such payment was not required, and (b) Nonnenmacher's approval in 2007 of a transaction by Nordbank's London Branch known as "Omega," in which Nordbank incurred substantial losses.  None of these matters had anything to do with the New York Branch.

18.    Thus, as the September 2009 elections approached – elections brought about at least in part by all the controversy surrounding Nordbank – Nordbank and Nonnenmacher found themselves subjects of the political debate, and political liabilities to their party.  Nonnenmacher was at risk of losing his incredibly lucrative job, especially if the political party in power lost.  As a result, Nonnenmacher made a conscious decision to save his job by destroying Kiser's career and reputation. Nonnenmacher needed public scapegoats whom he could blame for Nordbank's problems and thereby divert attention from himself, preferably as close in time prior to the elections as possible.  Kiser was chosen as the primary scapegoat.

19.    Notwithstanding the two prior investigations exonerating Kiser, a "new" investigation was hastily convened by Nordbank in May and June 2009. The "new" investigation was to be led by Nonnenmacher's henchman and Chief Compliance Officer, Thomas Rabehl ("Rabehl").

20.    To induce Kiser's cooperation and lull Kiser into a false sense of security – even though Nonnenmacher had already decided Kiser's fate – Rabehl and others falsely stated to Kiser that the "new" investigation was to be fair and objective. In fact, the outcome of the "new" investigation had been predetermined.

21.    Nonnenmacher waited to publicize the "new" investigation, until the elections approached.   Just 10 days before the elections, "new" findings – hastily reached and never shown to Kiser – were purportedly reached and used as the basis to terminate Kiser.  Kiser was terminated "for cause" on September 17, 2009 and the news of this termination was quickly rushed into the German news by Nordbank at Nonnenmacher's direction.

22.    Given the seriousness of the "cause" standard, the statements Nonnenmacher caused Nordbank to make were and are inherently defamatory of Kiser. Further, they specifically referred to "irregularities" in connection with Kiser. There were no "irregularities" for which Kiser was responsible.

23.    On information and belief, since Nordbank's investigations had already exonerated Kiser for the matters raised by the disgruntled ex-employees, Nordbank is now claiming as "cause" that Kiser -- innocent of the matters he was accused of by the ex-employees -- "interfered" with the investigation of those accusations.  The fact is that Kiser never did the things alleged to be the "cause" for his

termination. Nordbank has acted in a completely pretextual manner at Nonnenmacher's instance, and to further Nonnmacher's goals of retaining and consolidating his power, and eliminating others at Nordbank who might stand up to him.

24.     As a result, Kiser is entitled to damages from Nordbank (i) for breach of the Employment Agreement in an amount not less than $2,490,726 plus applicable interest, (ii) for liquidated damages and attorneys' fees under the New York State Labor Law, and (iii) for defamation and other torts in an amount not less than $10 million; and punitive damages should be awarded against Nordbank in an amount not less than $25 million, which should be enough to deter Nordbank from continuing its wrongful and malicious treatment of United States employees.

25.     In an unsurprising denouement to Nordbank's wrongful termination and defamation of Kiser, on September 21, 2009 – just four days after the press release about Kiser's termination – Nordbank issued a press release about the controversial $45 million payment to Goldman Sachs that Nonnenmacher approved; and Nordbank's press release about Nonnenmacher's role in the approval of the disastrous "Omega" transaction followed shortly thereafter, on October 14, 2009.

## The Parties

26.     Kiser is a citizen of the State of New York residing at 3197 Clubhouse Road, Merrick, New York 11566.

27.     Nordbank is a banking corporation organized pursuant to the laws of Germany, having its principal places of business in Hamburg and Schleswig-Holstein, Germany, and its New York Branch at 230 Park Avenue, New York, New York 10169.

**Jurisdiction and Venue**

28.     This Court has subject matter jurisdiction of this action pursuant to

28 U.S.C. § 1332(a)(2), as the matter in controversy exceeds the sum of $75,000,

exclusive of interest and costs, and is between a citizen of a State and a citizen of a

foreign state.

29.     Venue in this District is proper pursuant to 28 U.S.C. § 1391

because a substantial part of the events and omissions giving rise to the claim occurred in

this District, and Nordbank is subject to personal jurisdiction in this District.

30.     Nordbank is subject to personal jurisdiction in this District because

it transacted and transacts business in the State of New York through the New York

Branch and otherwise.  Nordbank is registered with and supervised by the New York

State Banking Department as a "Foreign Branch."

**STATEMENT OF FACTS**

**A.     Kiser Is Hired by Nordbank to Build the New York Branch**

31.     Kiser is a highly experienced and capable banking executive with

particular experience in setting up and running bank operations, including but not limited

to Legal & Compliance, Human Resources, Audit, Finance & Risk, Information

Technology, Operations, Marketing & Communications and Facilities Management.  At

the time he was hired by Nordbank in 2002, Kiser had over 20 years experience in the

international banking industry, and his reputation with U.S. regulators was outstanding

(as it continued to be until his wrongful termination by Nordbank).

32.     In June 2002, Nordbank hired Kiser as GM and COO of the New

York Branch, to open the New York Branch from "scratch," and thereafter build it into a

substantial banking operation following best practices as applied in the United States.

33.    Kiser was highly successful in carrying out his assignment.  He led the opening of the New York Branch and by 2008 had built it into an operation with $1.13 billion in revenues and $548 million in net operating result, after costs and before taxes, since inception.  On information and belief, the New York Branch was the most profitable Branch operation of Nordbank.

34.    Kiser's success was acknowledged by Nordbank as reflected by, among other things, Nordbank's entering into the Employment Agreement with Kiser as of June 1, 2007.  The Employment Agreement, as more fully described below, had a six-year term, through June 1, 2013, and provided Kiser with salary, annual incentive bonuses, the LTIP incentive plan, retirement, medical, dental and other benefits, and a vehicle allowance.

**B.    The Krasner, Colamaria and Aledia/Lopez Claims**

35.    Generally, Nordbank is organized with Regional Heads ("RHs") and Global Heads ("GHs") of different substantive divisions of Nordbank supervising their areas wherever located geographically.  However, during 2007, Marketing & Communications ("M&C") for the New York Branch was an exception to this policy. M&C for the New York Branch was handled locally as part of Corporate Services without reporting directly to a GH in Germany.

36.    In early 2007, Bernhard Blohm ("Blohm"), Nordbank's Head of Marketing & Communications, informed Kiser that he was to formalize the M&C reporting structure for the New York branch in accordance with the standard organization of Nordbank and that, as a result, the board of Nordbank had approved an initiative to restructure M&C in a manner that would reduce Nordbank's staff on a global basis, including positions at the New York Branch.

37.     As part of the global restructuring in 2007, Kiser was requested to, and did, provide Nordbank with a staff restructuring plan for the New York Branch.

38.     The restructuring plan for the New York Branch included, at Blohm's request, and with the support of the other responsible GHs, the relocation from Germany to New York of an M&C expert already working for Nordbank named Carolina Rappold ("Rappold"). Rappold was interviewed by both Branch Managers of the New York Branch in August 2007, and scheduled to assume her position in New York effective January 1, 2008.

39.     Consistent with the M&C Head's directives, the restructuring of the New York Branch's M&C and Corporate Services functions, and in particular Rappold's move to the New York Branch, rendered redundant or unnecessary the positions of certain employees of the New York Branch working in M&C. These employees included David Krasner ("Krasner") and Leslie Colamaria ("Colamaria"). Simply put, the New York Brach only needed one M&C executive specialist. Adding Rappold in New York would have given the New York Branch three M&C executives. Thus, Krasner's and Colamaria's positions were redundant under the restructuring plan proposed and approved by Nordbank's GHs.

40.     In August 2007, Krasner and Colamaria made a business trip to Germany that included a visit to Nordbank's home office. At that time, on information and belief, a Nordbank M&C employee in Germany informed Krasner and Colamaria of the impending restructuring and its expected effect on their jobs. At the same time, Krasner and Colamaria were determined by Nordbank M&C in Germany to be

insufficiently professional to justify retraining or reassignment in view of Rappold assuming her M&C position at the New York branch.

41.    Upon their return to New York, Krasner and Colamaria confronted Kiser about the restructuring and became uncooperative and unprofessional in their conduct. Nordbank publicly announced the restructuring on September 18, 2007, but the announcement was expected among Nordbank employees who were already aware of the pending restructuring. At or shortly after that time, Krasner and Colamaria for the first time complained that Kiser was handling their employment unfairly, supposedly because of a paramour relationship between Kiser and another employee of the New York Branch, Melissa Campfield ("Campfield").

42.    In fact, there was and is no amorous relationship between Kiser and Campfield. Those allegations by Krasner and Colamaria are false.

43.    With Rappold scheduled to start on January 1, 2008, and with Krasner and Colamaria having become uncooperative and unprofessional since they learned of the restructuring, Klaus Bernhart ("Bernhart"), co-manager and Regional Head of the New York Branch, determined to, and did, terminate the employments of Krasner and Colamaria effective November 5, 2007. These terminations were known to and approved by all responsible senior officials of Nordbank as required under the RH/GH structure.

44.    Despite the falsity of and complete lack of merit to their allegations, both Krasner and Colamaria sued Nordbank (and in Krasner's case, Kiser as well) in this Court. Both complaints contained a variety of – completely false – salacious allegations about Kiser and Campfield.

45.    Nordbank and Kiser have moved to dismiss both cases.  Nordbank is on the record in this Court stating that the claims against Kiser are without merit.

46.    There is no proof that Kiser engaged in an inappropriate relationship while at Nordbank.

47.    Finally, while still at Nordbank, Kiser was asked by Board Member Bernhart Visker ("Visker") to lead the investigation of allegations and counter-allegations by Nordbank employees named Rhona Aledia ("Aledia") and David Lopez ("Lopez"), respectively.  These allegations involved Nordbank's Commodity Finance division operating primarily in South America and had nothing to do (a) with Kiser, other than that he was necessarily one of the persons involved in investigating them; and (b) with the Krasner and Colamaria allegations.  This matter was resolved in due course, with the involvement of the Head Office Investigation Committee.  The Investigation Committee of Nordbank never criticized Kiser's involvement with it.

**C.    Nordbank Investigates and Exonerates Kiser**

48.    As a result of the Krasner/Colamaria allegations, Nordbank retained two leading New York law firms – M&S and Proskauer – to investigate those allegations and determine their truth or falsity.

49.    Those investigations were thorough and impartial.  ***Both exonerated Kiser, on behalf of Nordbank, as innocent of the Krasner/Colamaria allegations.***  Nordbank proceeded to defend the Krasner and Colamaria claims in this Court on the basis that they are meritless.

50.    The M&S investigation started in September 2007, and was concluded as of October 29, 2007.  The Proskauer investigation started in December 2007 and was concluded as of April 4, 2008.  Nordbank at no time – prior to the events

complained of herein in 2009 – suggested to Kiser that he was in any way at fault in the

Krasner and Colamaria matters.  To the contrary, Kiser received a favorable review by

Nordbank management, as he had previously, for the good job he was doing.  All that

was to change, however, when Nonnenmacher came under political pressure for

Nordbank's poor performance, as well as its risk management and operating problems,

that started in 2008 and continued into 2009.

51.    Notably, the New York Branch was never accused of having either

of these problems.  The 2007 Audit Report for the New York Branch confirmed that its

organizational structure was in line with Nordbank's strategy, and that the segregation of

functional tasks as required by the German regulators was established and kept in place.

In the Audit Report's conclusion, the New York Branch was reported to be appropriately

linked to Nordbank's Head Office, confirming the close contact between the New York

Branch and the GHs to which it reported.

**D.    Political Pressure on Nonnenmacher Mounts in 2009**

52.    The credit crisis that began in 2007 took its toll on Nordbank in

2008 as it did with many banks.  Nordbank experienced heavy losses in 2008.  Those

losses continued into 2009, and Nordbank has publicly announced that it will not be

profitable until at least 2012.

53.    As previously noted, as a Landesbank, Nordbank is state-majority-

owned and its Supervisory Board is politically appointed.  Thus, Nordbank's heavy losses

– virtually none of which were attributable to the New York Branch, which remained

relatively successful – led to political pressure on Nonnenmacher.  In particular, the

pending September 27, 2009 elections – themselves brought about in part by Nordbank's

poor performance – loomed as a potential disaster for Germany's political party in power, to which Nonnenmacher was answerable.

54.    To compound matters, the German media learned of the allegations in the Krasner and Colamaria complaints against Nordbank, and ran sensationalistic articles about those allegations. Even though those allegations were untrue, the news coverage of them put additional pressure on Nonnenmacher.

55.    Instead of doing what a bank CEO acting professionally would have done – protect his staff from such false and sensational articles – Nonnenmacher decided Nordbank would remain silent, seriously embarrassing Kiser and his family, some of whom live in Switzerland and directly read the false stories in the German language. Kiser was forced to engage German counsel to enforce German privacy laws, a service that a German corporation would typically provide for its executives.

56.    Nonnenmacher saw these pressures, however, as an opportunity to consolidate his power within Nordbank and eliminate potential rivals, including board members Peter Rieck ("Rieck"), the Deputy Chief Executive Officer of Nordbank also responsible for the New York Branch, and Visker. Nonnenmacher further saw the opportunity to obtain or maintain multiple positions – as CEO, COO, CFO and CRO – such multiplicity of positions allowing him to draw the exorbitant annual compensation of 2.9 million Euros – even though Nordbank and the German federal government, as a condition for the latter guaranteeing up to 30 billion Euros in securities issuance by Nordbank, had agreed annual compensation for Board members would not exceed 500,000 Euros. Finally, Nonnenmacher saw the press coverage of the allegations against the New York Branch as a means to draw attention away from himself, the bad

performance of Nordbank and other controversies involving Nordbank, such as its risk

management and operating deficiencies, and the impending Goldman Sachs and

"Omega" revelations – on the eve of the September 27, 2009 elections.

E.     **The Bogus "New Investigation" in 2009**

57.     The means Nonnenmacher used to accomplish his ends was a

bogus "new investigation" of the Krasner and Colamaria allegations (and certain related

allegations) – *even though Nordbank had previously conducted two investigations,*

*through M&S and Proskauer, and exonerated Kiser.*

58.     The timing of the bogus "new investigation" was carefully crafted

to allow press releases portraying Nonnenmacher in an heroic "I took action" light to be

released by Nordbank on the eve of the September 27, 2009 elections.

59.     Thus, although the bogus "new investigation" was commenced in

May 2009, it was not announced to the public until August 26, 2009 – an inexplicable

delay if Nordbank's intent was actually to timely inform the public.  The August 26, 2009

press release inaccurately suggested that the Krasner and Colamaria claims had arisen

"recently," when in fact they were two years old, and misstated that the New York

Branch had "learn[ed] of the first accusations of discrimination in October 2008," when

in fact those accusations were first made over a year earlier, in September 2007 and were

well known to senior management and Board members in Germany, including

Nonnenmacher.  The purpose of these misstatements was to confuse the public and

conceal the fact that the Krasner and Colamaria allegations were "old news" not requiring

a new, third investigation after Kiser had already been exonerated.

60.     The August 26, 2009 press release included statements by Nonnenmacher on behalf of Nordbank that, taken alone or together with other statements by Nordbank (described below), were inherently defamatory of Kiser, including:

> "The behavior at issue is completely at odds with the corporate values of HSH Nordbank. Should the allegations made be corroborated in the course of the internal and legal review, the Bank will take vigorous action," said Dirk Jens Nonnenmacher, CEO of HSH Nordbank.

61.     The bogus "new investigation" continued through the summer of 2009, but never included the most obvious subject:  the 2007 restructuring of Nordbank, and in particular the New York Branch M&C group, that lead to the Krasner and Colamaria allegations. ***Thus, the responsible GHs of Nordbank, who had material knowledge pertinent to the ostensible scope of the bogus "new investigation," were never interviewed or consulted at all during the investigation.***  In addition, the following Business Units in Nordbank's Head Office were excluded by Rabehl from the investigation for fear that the information they provided – that Krasner and Colamaria were simply disgruntled employees who were terminated because of the M&C restructuring in 2007 – would support Kiser and therefor be contrary to Nonnenmacher's predetermined outcome:  Communications, Legal, Compliance, IT-Technology, Human Resources and Facilities Management.  Rabehl and the Investigation Committee purposely left those business units, which should have been included in the investigation, out of the investigation.  Those business units would have provided information to the "investigators" which would have demonstrated that Kiser had done nothing wrong.  These deliberate investigative omissions by the investigators further confirmed that the "new investigation" was just a charade intended to make a scapegoat of Kiser and others, not an actual search for the truth.

62.     As the September 27, 2009 elections neared, the "investigators" conducting the bogus "new investigation" rushed Kiser and others to complete multi-page written questionnaires in two days, while failing to interview others who had knowledge about the matters under investigation.  The "urgency" the investigators purported to feel had an obvious source – Nonnenmacher and his political advisers were insisting on dismissing Kiser and others, and issuing another press release trumpeting those dismissals, such that the press release could be issued approximately 10 days or so prior to the elections.

63.     Following that timing to the day, on September 17, 2009, exactly 10 days prior to the elections he feared his party would lose, Nonnenmacher rigged a "vote" of the Nordbank Board to dismiss Kiser.

**F.     Nonnenmacher Rigs the Board "Vote" and Further Defames Kiser**

64.     On information and belief, the bogus "new investigation" revealed nothing constituting "cause" to terminate the Employment Agreement "for cause."  That, however, did not deter Nonnenmacher.

65.     Nonnenmacher caused a short summary of the "new investigation" to be prepared for the Board (the "Board Summary") and called for a vote on a resolution dismissing Kiser "for cause."  On information and belief, the Board Summary (which Nordbank has refused to provide to Kiser, despite demand) did not contain sufficient evidence justifying a "for cause" dismissal of Kiser.

66.     On information and belief, since Nordbank was unable to corroborate Krasner's and Colamaria's claims involving Kiser, in the Board Summary Nordbank asserted in vague and conclusory terms that Kiser had "interfered with" the prior investigations by the M&S and Proskauer law firms that had exonerated him; and

that the New York Branch was too independent of the Home Office in Germany, even though Nordbank's own Audit Reports had previously concluded otherwise. Since Nordbank has refused to provide Kiser with the Board Summary or the so-called investigatory report on which it was based, despite demand, their exact words cannot be recited in this Complaint. However, on information and belief the Board Summary was per se defamatory to Kiser, as Nordbank used it to invoke Section 6(iii) of the Employment Agreement, under which Kiser must be found to have "intentionally engag[ed] in conduct which is injurious to [Nordbank] or its subsidiaries or affiliates, including, but not limited to, theft, violent work-related behavior, sexual or other unlawful harassment, repeated acts of insubordination, willful dishonesty or fraud in connection with [Kiser's] employment."

67.    Besides the fact that no "cause" for dismissing Kiser existed, Nonnenmacher had a further problem: two of the four Board members of Nordbank were not in favoring of terminating Kiser at all, much less "for cause." On information and belief, two of the four members of the Board of Nordbank, Rieck and Visker, were prepared to vote against terminating Kiser. (The other Board member, Jochen Friedrich ("Friedrich"), was prepared to vote however Nonnenmacher told him.) Thus, Nonnenmacher faced a 2-2 tie vote, which would have been insufficient for Nordbank to terminate Kiser "for cause." This deadlock occurred at a time when three Board seats, to achieve the stated number of seven Board members, were unfilled. The proper course of action would have been to take the matter to the Supervisory Board.

68.    On information and belief, however, Nonnenmacher directed Rabehl to "recuse" Rieck and Visker from voting, on the trumped-up ground that they

had a "conflict" (which they did not). Nonnenmacher and Friedrich then concluded the months-long charade by voting to terminate Kiser "for cause."

69.    Thus, there was never any vote by a majority of the Board to terminate Kiser "for cause." Rather, there was only a 2-0 vote in which the two Board members who supported Kiser were not permitted to cast their votes. This violated basic principles of corporate governance and fundamental fairness, *as well as the Employment Agreement which required, in Section 6, that "The existence or non-existence of Cause shall be determined in good faith by the Board."*

70.    At Nonnenmacher's behest, Nordbank rushed to the press with its latest defamatory press release. On or about September 17, 2009 – ten days before the German elections on September 27, precisely according to plan – Nordbank issued a press release, also published on its website, stating:

**Hamburg/Kiel, September 17, 2009** - Following an investigation of operations in its New York branch, HSH Nordbank has implemented management changes with immediate effect. The *bank has dismissed one of the branch's three General Managers* and the head of the local legal department.

Former employees claimed *of being discriminated against* by members of the managerial staff at the branch. *On becoming aware of the accusations*, the bank set up a body of inquiry to review the allegations. The investigators were supported in their work by a New York law firm and an audit firm who have now delivered independent reports on their findings.

"We made a conscious decision to seek a clear picture of the situation. *After receiving the results of the investigations, we decided to take the actions we have now implemented*" states HSH Nordbank Board Chairman Dirk Jens Nonnenmacher.

*Nonnenmacher had repeatedly made unequivocally clear that any irregularities would be straightened out without reservation*. The bank's Compliance System, whose purpose is to prevent and reveal irregularities, has been considerably expanded in consequence. (Emphasis added.)

71.    In the context of previous news reports and statements by Nordbank, it was clear to any reader of the September 17, 2009 press release that Kiser was the "dismissed" general manager referred to.  The September 17, 2009 press release was false and defamatory because it conveyed to readers thereof the clear and distinct impression that Kiser had been found guilty by "independent" investigators of having "discriminated against" members of the managerial staff at the New York Branch and having engaged in "irregularities."

72.    The September 17, 2009 press release was per se libelous of Kiser because it injured him in his trade and profession.

73.    The press release was also false and misleading in other respects, including conflating the time of the "accusations" with the "set[ting] up" of a "body of inquiry to review the allegations," when in fact the bogus 2009 "investigation" was "set up" almost two years after the fact and long after Nordbank "be[came] aware of the accusations," and after two previous investigations on behalf of Nordbank had *exonerated* Kiser.  Further, the release was false and misleading in stating that the 2009 investigation was "independent," when in fact its outcome was preordained by Nonnenmacher for release just before the September 27 elections.

### AS AND FOR A FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)

74.    Plaintiff repeats and realleges the allegations of paragraphs 1 - 73, above, as if fully set forth herein.

75.    The Employment Agreement was a valid and binding contract effective through June 1, 2013.

76.     Kiser duly performed his obligations under the Employment
Agreement.  He received favorable reviews from Nordbank for his work up until the time
in 2009 that Nonnenmacher engaged in the conduct described above.

77.     No "cause" existed to terminate the Employment Agreement.

78.     In breach of Section 6 of the Employment Agreement, "The
existence or non-existence of Cause" was not "determined in good faith by the Board," as
required by Section 6 of the Employment Agreement.

79.     Nordbank's termination of Kiser "for cause" when no "cause"
existed to terminate the Employment Agreement, and without a good faith determination
of Cause by the Board, was a breach of the Employment Agreement by Nordbank,
entitling Kiser to damages for breach of contract.

80.     In the event of a without-cause termination of the Employment
Agreement, Kiser was entitled to the following:

      (a) Base salary through 2013 of $1,135,890;

      (b) Bonuses through 2013 of at least $912,887;

      (c) Deferred compensation of at least $265,959;

      (d) Guaranteed 2008 bonus of $100,000; and

      (e) Reimbursement for legal expenses in Germany, as more fully
           described below, in at least the amount of $76,000.

81.     The amounts set forth above, in the aggregate amount of
$2,490,726, plus interest, are the minimum breach of contract damages to which Kiser is
entitled for Nordbank's breach of the Employment Agreement.  Kiser reserves the right
to prove at trial such other and further damages as he may have suffered.

## AS AND FOR A SECOND CAUSE OF ACTION
## <u>(VIOLATION OF NEW YORK LABOR LAW)</u>

82.    Plaintiff repeats and realleges the allegations of paragraphs 1 - 81, above, as if fully set forth herein.

83.    Kiser was an employee of Nordbank under the New York Labor Law.

84.    The compensation of Kiser referred to in ¶ 80 above had been earned by Kiser and vested, and was owed to him without further contingency in the absence of a valid and justifiable termination for "cause," and said compensation constituted wages under the New York Labor Law.

85.    The withholding from Kiser by Nordbank of base salary, bonuses and deferred compensation as set forth above, in addition to being a breach of contract, constitutes a violation of New York Labor Law § 190 et seq., including without limitation New York Labor Law § 193 (unlawful withholding of wages).

86.    Nordbank's withholding of wages was willful, having been done knowingly, deliberately and voluntarily in disregard of its obligations.  Further, as set forth above, Nordbank did not have a good faith basis to believe that its withholding of wages was in compliance with the law.

87.    Nordbank's violation of the New York Labor Law renders Nordbank liable to Kiser for (a) the amounts of wages in the form of base salary, bonuses and deferred compensation set forth above, (b) in addition, statutory liquidated damages in an amount equal to 25% of the wages unlawfully withheld and (c) Kiser's costs and expenses, including attorneys' fees, incurred in this action.

## AS AND FOR A THIRD CAUSE OF ACTION
## (DEFAMATION)

88.    Plaintiff repeats and realleges the allegations of paragraphs 1 - 87, above, as if fully set forth herein.

89.    The false statements by Nordbank set forth above, including but not limited to the August 26, 2009 and September 17, 2009 press releases and the Board Summary, were defamatory of Kiser per se.  They tended to, and did, injure Kiser in his trade and profession of banking executive.

90.    Nordbank's false and defamatory statements about Kiser in the August 26, 2009 and September 17, 2009 press releases were published to literally millions of people, as they were published in the German media and posted directly onto Nordbank's website www.hsh-nordbank.com – an English language website specifically created to be read in the United States, including by the banking and financial community in the New York area of which Kiser is a member.

91.    The Board Summary was published to the Board by Nordbank to induce in the members of the Board the belief that Kiser had "intentionally engag[ed] in conduct which is injurious to [Nordbank] or its subsidiaries or affiliates, including, but not limited to, theft, violent work-related behavior, sexual or other unlawful harassment, repeated acts of insubordination, willful dishonesty or fraud in connection with [Kiser's] employment," when in fact Kiser had done no such thing.

92.    On information and belief, Nordbank also published false and defamatory statements about Kiser to German and U.S. regulators in June and September 2009, the exact contents of which cannot be known to Kiser until he has the opportunity to take discovery in this action.

93.    Nordbank's false and defamatory statements about Kiser caused serious harm to the reputation of Kiser.

94.    Nordbank's statements about Kiser were made with malice or, at a minimum, reckless indifference to their truth or falsity.  Nonnenmacher wished to save his own job by sacrificing Kiser in a blitzkrieg of defamation on the eve of the German elections.  Nonnenmacher got the electoral result he wished; now, Nordbank must pay Kiser the damages it has caused him.

95.    Due to the reaction of the media in Germany, various newspapers printed Kiser's full name and a picture of him – unlawfully copied from a source on the Internet – both in print and on the Internet.  Kiser was forced to hire a German media law firm, at a cost of over $76,000, to protect his name and reputation, impacting not only him as a person and professional, but also his entire family.

96.    Nordbank's false and defamatory statements about Kiser were made without privilege or in abuse of any limited privilege.

97.    Kiser suffered both general and special damages from Nordbank's defamation, as he is currently unable to obtain employment appropriate to his skills and experience as a result of that defamation.

98.    Kiser is entitled to damages from Nordbank for its false and defamatory statements about him in an amount to be proven at trial, but not less than $10,000,000.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (FRAUD)

99.    Plaintiff repeats and realleges the allegations of paragraphs 1 - 98, above, as if fully set forth herein.

100.　　Nordbank represented to Kiser, through statements of Rabehl and others on the Investigation Committee in May and June 2009, that the "new investigation" to be conducted in the summer of 2009 was to be an independent and objective investigation.　On information and belief, Nonnenmacher caused these statements to be made with the intent to mislead Kiser.

101.　　Nonnenmacher and, on information and belief, others at Nordbank knew at the time of these statements to Kiser that the statements were false and fraudulent.　In fact, Nonnenmacher had already predetermined as of May and June 2009 that – whatever the actual facts – the "investigation" would paint Kiser in a negative light and come up with grounds, however flimsy and false, to terminate Kiser for cause.

102.　　Kiser relied on Nordbank's misrepresentations in not taking steps with the Board and others in Germany who could have prevented Nonnenmacher from carrying out his scheme had Kiser been given honest disclosure of Nonnenmacher's intentions and an opportunity to be heard by the Board and/or Supervisory Board.

103.　　Kiser's reliance on Nordbank's misrepresentations caused Kiser damage in that it subjected him to the severe reputational harm described above, making it extremely difficult for Kiser to find further employment in the banking industry.

104.　　As a result of Nordbank's fraud, Kiser has been damaged in an amount to be proven at trial.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (AGREEMENT TO INDEMNIFY)

105.　　Plaintiff repeats and realleges the allegations of paragraphs 1 - 104, above, as if fully set forth herein.

106.    Goessmann, Chief Legal Officer of Nordbank, represented and promised to Kiser, starting in May 2009 and several times thereafter, that if Nordbank's investigations of Kiser exonerated him, Nordbank would indemnify and reimburse Kiser for his legal expenses of enforcement of the privacy laws in Germany with respect to the defamatory statements made about Kiser there.

107.    Nordbank's first two investigations exonerated Kiser and the bogus 2009 "investigation," if fairly and objectively done, would also have done so.

108.    Kiser has incurred and continues to incur legal expenses of enforcement of the privacy laws in Germany with respect to the defamatory statements made about Kiser there.

109.    Kiser is entitled to indemnity and reiumbursement from Nordbank for such expenses, in an amount to be proven at trial but not less than $76,000.

### AS AND FOR A SIXTH
### AND ALTERNATIVE CAUSE OF ACTION
### (CONVERSION)

110.    Plaintiff repeats and realleges the allegations of paragraphs 1 - 109, above, as if fully set forth herein.

111.    Nordbank has converted to its own use Kiser's wages and deferred compensation as more fully set forth above.

112.    In addition, Nordbank is holding private property of Kiser involuntarily left by him in what was his office, and Kiser has been informed by Nordbank that Nordbank is not releasing Kiser's property until further notice.

113.    Further, Kiser has certain rights to the leased automobile he currently drives, as described in the Employment Agreement.  Kiser has made a

reasonable proposal to Nordbank for a transition of the automobile lease from
Nordbank's name to his name, to which Nordbank has not responded.

114.    Kiser is entitled to damages for Nordbank's conversion as set forth
above, in an amount to be determined at trial.

## AS AND FOR AN SEVENTH
## CAUSE OF ACTION
## (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

115.    Plaintiff repeats and realleges the allegations of paragraphs 1 - 114,
above, as if fully set forth herein.

116.    As set forth above, at some point in 2009 Nonnenmacher made a
conscious decision to save his own lucrative job by defaming Kiser and wrongfully
terminating him.  On information and belief, Nonnenmacher knew full well he was acting
in a wrongful manner and so took steps against Kiser not remotely justified by the
circumstances even if "cause" existed, which it did not.

117.    On information and belief, Nordbank has had Kiser followed and
has caused his telephone and other communications to be monitored.

118.    On information and belief, after defaming Kiser to the media,
Nordbank has deliberately created a media climate in which every reference to a new
scandal at Nordbank – of which there are many, now including scandals directly
implicating Nonnenmacher – are referred and associated back to Kiser's termination as
though he had something to do with the new scandals, which he did not.

119.    On information and belief, Nordbank intended to terminate Kiser
by means of a humiliating "perp walk" at the New York Branch, in which Kiser was to be
escorted by security guards off the premises and photographed in that process.

Nordbank's plan was foiled as, on the date in question, Kiser went to see his doctor because of stress symptoms caused by Nordbank's actions. In fact, Kiser's termination occurred via e-mail while he was at the doctor, an act directly contrary to Nordbank's stated "Corporate Values" and any common standard of decent behavior.

120.    Nordbank has also maliciously turned off Kiser's cell phone number used since the inception of the New York Branch in 2002, even though it is standard practice in the New York Branch to allow departing staff to retain such cell phone number on their own account.

121.    Kiser suffered severe stress and emotional distress as a foreseeable consequence of Nordbank's malicious actions.

122.    At all relevant times, Nordbank acted with malice, particularly on Nonnenmacher's part, toward Kiser, or at a minimum with a reckless disregard equivalent to malice as to whether its actions would inflict emotional distress on Kiser, which was completely foreseeable under the circumstances. No legitimate interest of Nordbank was served by its behaving in this manner.

123.    Kiser is entitled to damages for Nordbank's intentional infliction of emotional distress as set forth above, in an amount to be determined at trial but not less than $10 million.

### REQUEST FOR PUNITIVE DAMAGES

124.    Plaintiff repeats and realleges the allegations of paragraphs 1 - 123, above, as if fully set forth herein.

125.     Nordbank's defamation, fraud, conversion and intentional infliction of emotional distress on Kiser was outrageous, in violation of public policy, and directed at several Nordbank executives, not only Kiser.

126.     Further, Kiser and the general counsel of the New York Branch, who was also terminated, were singled out as non-German employees; Kiser is a United States citizen of Swiss background and the former general counsel is a United States citizen.  Germans equally implicated in everything of which Kiser was accused were not terminated.  Basically, Nonnenmacher singled out the officers whose heads he wished to roll in order to save Nonnenmacher's job, and those were the heads that rolled.  Willful and contumacious conduct of this type towards United States citizens by a foreign bank operating in the United States should not be tolerated; it is conduct of the type that is appropriately deterred by an award of punitive damages.

127.     As set forth above, at all relevant times Nordbank acted with malice towards Kiser or with a reckless indifference to the consequences of its actions that is equivalent to malice.

128.     On information and belief, given Nonnenmacher's demonstrated propensity to waste Nordbank's money on questionable payments (such as the $45 million dollar payment in 2008 to Goldman Sachs) and questionable expenditures (such as the cost of the bogus "investigation" of Kiser and others in 2009, which on information and belief will exceed $1 million by the time it concludes), punitive damages of at least $25 million are necessary in order to deter future such conduct – to  send a clear message to the Board of Supervisors and shareholders of Nordbank that Nonnenmacher's way of doing business will not be tolerated in the United States.

129.    Accordingly, punitive damages of at least $25 million should be awarded against Nordbank by the jury in this action.

WHEREFORE, plaintiff Kiser demands judgment in his favor and against defendant Nordbank as follows:

(i)     On his First Cause of Action, in an amount not less than $2,490,726 plus applicable interest;

(ii)    On his Second Cause of Action, in an amount not less than $2,490,726 plus applicable interest, plus (a) liquidated damages in the amount of an additional 25% of the amount withheld from plaintiff and (b) plaintiff's costs and expenses incurred in this action, including his attorneys' fees;

(iii)   On his Third Cause of Action, in an amount to be determined at trial but not less than $10 million;

(iv)    On his Fourth Cause of Action, in an amount to be determined at trial;

(v)     On his Fifth Cause of Action, in an amount to be determined at trial but not less than $76,000;

(vi)    On his Sixth Cause of Action, in an amount to be determined at trial;

(vii)   On his Seventh Cause of Action, in an amount to be determined at trial but not less than $10 million;

(viii)  Awarding punitive damages in an amount to be determined at trial, but not less than $25 million; and

(ix)    Granting such other and further relief as the Court may deem just

and proper under the circumstances.

Dated:  October 19, 2009

MILLER & WRUBEL P.C.

By: _____
Joel M. Miller
Charles R. Jacob III
570 Lexington Avenue
New York, New York 10022
(212) 336-3500

Attorneys for Plaintiff

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R.Civ. P. 38(b), plaintiff hereby demands a jury trial of

all claims and issues set forth herein that are triable by a jury.

Dated:  October 19, 2009

MILLER & WRUBEL P.C.

By: _____
Joel M. Miller
Charles R. Jacob III
570 Lexington Avenue
New York, New York 10022
(212) 336-3500

Attorneys for Plaintiff