Joel M. Miller
Charles R. Jacob III
MILLER & WRUBEL P.C.
570 Lexington Avenue
New York, New York 10022
(212) 336-3500

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROLAND KISER,<br><br>                          Plaintiff,<br><br>     -against-<br><br>HSH NORDBANK AG,<br><br>                          Defendant. | 09 Civ. 8849 (JSR) (AJP) |

## DECLARATION OF ROLAND KISER

Roland Kiser hereby declares under penalty of perjury as follows:

1.    I am the plaintiff in this action. I am a United States citizen residing in Merrick, New York. I am married, with three children.

2.    From my discussions with personnel of defendant HSH Nordbank AG ("Nordbank") and journalists in the German media, I am informed and believe that during the Summer and Fall of 2009, media relations personnel of Nordbank were feeding stories about me to the German media.

3.    For example, on October 8, 2009, three weeks after my termination from Nordbank on September 17, three German newspapers published on the same day extremely similar stories referring to me, directly or indirectly. These newspapers are, to the best of my knowledge, unaffiliated with each other and very different from each other in terms of their target audience. They are: (1) the Hamburger Abendblatt (an afternoon

general circulation newspaper in Hamburg, where Nordbank is based); (2) Financial Times Deutschland (the German affiliate of Financial Times, the financial newspaper published worldwide); and (3) Die Welt, a newspaper in general circulation throughout Germany. Copies of these articles are annexed as Exhibits 1, 2 and 3.

4.      I realize that an exact and complete translation of these articles for the Court will be made at some point by a certified translator. However, I am fluent in both English and German. I represent to the Court that each of these articles contains (1) reference to alleged fraud at Nordbank's London Branch and (2) in a continuation of that discussion, a direct or indirect reference to me.

5.      As set forth in the Complaint, I was the General Manager and Chief Operating Officer of Nordbank's New York Branch. I had nothing to do with Nordbank's London branch, and no one inside or outside of Nordbank has ever suggested otherwise until these newspaper articles implied it.

6.      From the simultaneous appearance of these three very similar articles in three completely unrelated news publications on the same day, as well as my discussions with Nordbank personnel and journalists in the German media, I believe that Nordbank media relations personnel "fed" this "story" to the media.

7.      I further believe that this was done in an effort to confuse the media and the public with respect to matters that were about to be revealed with respect to Nordbank's CEO, Dirk Jens Nonnenmacher ("Nonnenmacher"), including (a) a disastrous transaction known as "Omega," in which Nordbank incurred a loss of approximately 500 million Euros ($750,000,000), (b) a questionable $45 million payment

2

by Nordbank to Goldman Sachs and (c) the investigation of *Nonnenmacher* by criminal prosecutors in Hamburg with respect to these transactions.

8.  Attached as Exhibits 4, 5, 6, and 7 are copies of four articles from October 16 and 17, 2009 – the *next week* after the October 8 articles referring to me – from Spiegel Online (the online version of a newspaper in general circulation throughout Germany), the Sueddeutsche Zeitung (the South German newspaper), Bild Hamburg (a general circulation newspaper in Hamburg) and the Berliner Zeitung (Berlin Times).  I represent to the Court that each of these articles concerns the news that criminal prosecutors in Hamburg are investigating Nonnenmacher, among others, with respect to possible banking improprieties including (a) the "Omega" transaction and (b) the questionable $45 million payment to Goldman Sachs.

9.  I had nothing to do with Omega or the Goldman Sachs payment. Neither had anything to do with the New York branch of Nordbank.

10. The week after Exhibits 4, 5, 6 and 7 were published, on October 22 and 23, 2009, stories were published in (a) FOCUS Online (an on-line magazine) and (b) the Hamburger Abendblatt, media that are unrelated to each other so far as I know, containing references to me that are substantially similar to each other.  Copies of those articles are annexed as Exhibits 8 and 9.

11. I represent to the Court that both articles refer to a Nordbank spokesperson stating that Nordbank had found irregularities on my part with respect to expense claims for private ski vacations.

12. There were no such irregularities.  Nordbank held corporate ski events. I attended those events in the normal course of my job.  On one occasion, after a

3

Nordbank event in Jackson Hole, Wyoming, I remained in Jackson Hole for a few days to be with family members who were vacationing there separately, staying at a different hotel. Those expenses were paid by me personally, consistent with Nordbank policy, and did not cost Nordbank anything. No one inside or outside of Nordbank has ever suggested to me that this was inappropriate. I have reviewed Nordbank's "Executive Summary" of so-called "Cause" for my termination and it contains no reference to this. Since the October 22 and 23 articles were published, I have heard nothing more about this. I believe it is another example of the media "spin" described above to deflect attention away from Nonnenmacher's problems and place it on me. There are other examples besides those cited in this Declaration.

13. As more fully described in the Complaint, I was the subject of a sham "investigation" by Nordbank from May through September 2009. I wish to call the Court's attention to two further aspects of this "investigation."

14. First, the "investigation" was conducted by a New York lawyer named Michael Kopcsak ("Kopcsak") of Dunnington, Bartholow & Miller LLP ("Dunnington"). The "investigation" included Kopcsak interrogating me before a court reporter and demanding that I answer questionnaires in writing on very short notice. However, as detailed in the Complaint, Kopcsak excluded from his "investigation" a number of Nordbank officers and employees with relevant knowledge.

15. As of the time of this "investigation," I had over 23 years' experience in setting up and running bank operations, including but not limited to Legal & Compliance, Human Resources, Audit, Finance & Risk, Information Technology, Operations, Marketing & Communications and Facilities Management. Accordingly,

while I am not a lawyer, I am very familiar with how internal investigations are conducted with respect to banking matters.

16.     I observed that Kopcsak was disorganized in his handling of documents and other evidentiary materials, and disinterested in a number of the bank organizational issues bearing on his "investigation." I questioned him as to his experience in this area, and he avoided directly answering my question. He had been provided questions by PricewaterhouseCoopers Germany, and it was apparent to me and others that Kopcsak did not fully understand these questions, whether because of language difficulties or his lack of understanding of the subjects of the investigation. Accordingly, his questions were often unclear, unstructured or confusing.

17.     I was not aware at the time, but am now aware from Dunningon's website, that Kopcsak does not list internal investigations or bank-related compliance as among his areas of expertise as a lawyer. A copy of Kopcsak's web page from Dunnington's website is attached as Exhibit 10. It states as follows:

> **Michael J. Kopcsak** is a member of DBM's <u>corporate</u>, <u>litigation</u> and <u>art law</u> practice groups. ***Mr. Kopcsak concentrates on corporate transactions in areas of advertising and other service businesses***. Mr. Kopcsak has extensive experience in dealing with closely held corporations, partnerships, joint ventures, mergers and acquisitions and employment matters. Mr. Kopcsak also engages in a commercial and business litigation practice, including trials, appeals and arbitration. Mr. Kopcsak has served as general counsel to two of the world's largest publicly traded marketing communications companies. [Emphasis added in part.]

18.     Second, during the period of this sham "investigation," I was informed that I was also being investigated by private detectives hired by Nordbank. Based on my personal observation, on September 18, 2009, the day after Nordbank terminated me, at least two private detectives followed me in Manhattan, and one

5

attempted to monitor my e-mail communications in a public location. From my observation of these individuals, it appeared they wanted me to know I was being followed. I believe these individuals were working for Nordbank or Kopcsak.

19. Finally, I believe the allegations in ¶ 119 of the Complaint, that "Nordbank intended to terminate [me] by means of a humiliating 'perp walk' at the New York Branch, in which [I] was to be escorted by security guards off the premises and photographed in that process," are supported by the article from Financial Times Deutschland, dated October 25, 2009, attached as Exhibit 11. I represent to the Court that this article confirms that Nordbank's plan was as stated above. That information was not provided to Financial Times Deutschland by me or anyone I know. I believe Nordbank provided this information to the newspaper.

20. The "perp walk" never happened. I was suffering such severe stress from Nordbank's actions that I had to go to the doctor that day, and accordingly was not at the office at the time of the planned termination and "perp walk." However, I was aware at that time that Nordbank planned to terminate me in a humiliating way.

I declare under penalty of perjury and pursuant to 28 U.S.C. § 1746
that the foregoing is true and correct.

Executed on December 14, 2009

_____
ROLAND KISER